UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

TRACY WILSON, *et al.*,                    )
                                            )
             Plaintiffs,                    )
                                            )
v.                                          )        No.:   3:09-CV-199
                                            )               (VARLAN/GUYTON)
STATE FARM FIRE & CASUALTY,                 )
COMPANY,                                    )
                                            )
             Defendant.                     )

## MEMORANDUM OPINION

This is a breach of contract action by plaintiffs Tracy and Kim Wilson on a contract

of insurance issued by defendant State Farm Fire & Casualty Company ("State Farm").  The

matter is presently before the Court for a decision on the merits following a two-day bench

trial that took place on January 18 and January 25, 2011.  Plaintiffs seek relief for four causes

of action arising out of their insurance policy with State Farm: (1) breach of contractual

obligations under Coverage A (Dwelling); (2) breach of contractual obligations under

Coverage C (Loss of Use/Additional Living Expense); (3) violations of the Tennessee

Consumer Protection Act (the "TCPA"), Tenn. Code Ann. §§ 47-18-101, *et seq.*; and (4) a

violation of the Tennessee bad faith refusal to pay statute, Tenn. Code Ann. § 56-7-105 [*see*

Doc. 25].  Plaintiffs also assert that they are entitled to prejudgement interest.  State Farm

denies that it is liable to plaintiffs for these causes of action and asserts that plaintiffs are not

entitled to prejudgment interest [*see id.*].

After giving careful consideration to the applicable law, the testimony of the witnesses, the exhibits introduced at trial [*see* Doc. 37], the transcripts of the proceedings [Docs. 38, 39], the proposed findings of fact and conclusions of law, and the trial and post-trial briefs [Docs. 22, 30, 40, 41, 42], the Court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

Findings of Fact[1]

1.   Plaintiffs suffered a fire at their residence at 345 Dog Creek Lane, Jacksboro, Tennessee on April 14, 2008.  This is the date of loss [Doc. 25, p. 6].

2.   The cause of the fire was accidental [Doc. 25, p. 6].

3.   Plaintiffs paid when due all premiums on their fire insurance policy issued by State Farm, and such policy (#42-EF-1717-0) was effective on April 14, 2008 [Doc. 25, p. 6].

4.   According to the terms of plaintiffs' policy as in effect on April 14, 2008, the policy limit for fire damage to their dwelling is in an amount of up to $302,267.00 [Doc. 25, p. 6].

5.   After the fire damage occurrence, plaintiffs made a timely claim (Claim #42-B191-901) to State Farm for fire damage in accordance with the requirements of their policy [Doc. 25, p. 6].

---

[1]The Court makes only the findings of fact necessary to reach its conclusions of law.

6.     Steve Harris ("Harris"), a large loss claims representative for State Farm with fire damage claims experience, was the primary claims representative on behalf of State Farm for plaintiffs' claim [Doc. 38, p. 118].  Harris is not a contractor [*Id.*, p. 164]. Harris testified at trial as a witness for State Farm.

7.     On April 15, 2008, one day after the fire, Harris began his investigation of plaintiffs' loss and claim [Doc. 38, pp. 118, 120-21].  On that day, Harris visited plaintiffs' home to investigate the damage from the fire and deliver a "Large Loss Package" which contained plaintiffs' limits under Coverage A [*Id.*, pp. 120-26; Def.'s Ex. 32; Pl.'s Ex. 1].

8.     Joe Carey ("Carey") is a team manager with State Farm who has fire damage claims experience as both a team manager and as a claims representative [Doc. 39, p. 58]. Carey is not a contractor [*Id.*].  Carey was Harris's supervisor for plaintiffs' claim [*Id.*, pp. 58-59].  Carey testified at trial as a witness for State Farm.

9.     On May 6, 2008, Harris completed an estimate for $159,978.72 for the repair of plaintiffs' home [Pl.'s Ex. 5].  Harris used the Xactimate computer program to prepare his estimate [*Id.*; Doc. 38, p. 128].  Harris's estimate consists of more than thirty-one (31) pages [Pl.'s Ex. 5].

10.    Plaintiffs rejected Harris's estimate [Doc. 38, pp. 30-33].

11.    At Harris's suggestion, plaintiffs submitted the estimates of three licensed general contractors:  Michael Copeland ("Copeland") – $251,894.25; Jason Rutherford ("Rutherford") – $247,154.30; and E.L. Reynolds ("Reynolds") – $271,700.00 [Doc.

3

25, p. 6; Doc. 38, pp. 33-34; Pl.'s Ex. 7, 8, 9]. Each of these estimates consists of a single page and calls for the complete demolishment and rebuilding of plaintiffs' home [*see* Pl.'s Exs. 7, 8, 9].

12. Harris attempted to contact Copeland and Rutherford to discuss their estimates [Doc. 38, p. 138]. Harris spoke with Copeland about the basis of his estimate but never communicated with Rutherford or Reynolds [*Id.*, pp. 138-39, 165-66].

13. Copeland is a licensed general contractor, plumber, and electrician [Doc. 38, pp. 73-76]. Copeland works primarily as a Verizon corporate contractor although he has done some remodeling work in the past [*Id.*]. Copeland is not a structural engineer and he does not have experience in fire damage and restoration [*Id.*, p. 139]. Copeland testified at trial as a witness for plaintiffs.

14. Copeland inspected plaintiffs' home in May 2008 and used 2010 Craftsman, a computer program, to prepare his estimate [Doc. 38, pp. 78, 91-92].

15. After reviewing the estimates submitted by plaintiffs, Harris contacted Joseph Construction, a licensed commercial and restoration contractor, to prepare an estimate for plaintiffs' home [Doc. 39, pp. 6-7, 23-24]. Joseph Construction and its agents have extensive experience in fire damage and restoration [*Id.*].

16. Nick Nickels ("Nickels") is a project manager with Joseph Construction [Doc. 39, pp. 3-4]. Nickels has extensive fire restoration experience but he is not a licensed contractor [*Id.*]. Nickels prepared the estimate for Joseph Construction [*Id.*, pp. 23-24; Pl.'s Ex. 6]. Nickels testified at trial as a witness for State Farm.

4

17.     At the time it was contacted by Harris to do an estimate for plaintiffs' home, Joseph Construction was a participant in State Farm's Premier Service Program ("PSP") [Doc. 39, p. 7]. State Farm has about ten (10) local vendors involved in the PSP [Doc. 38, p. 178].

18.     Vendors in State Farm's PSP perform construction, repair, and restoration work for State Farm's policyholders to the extent a vendor is accepted by the policyholder to perform specified work [Doc. 39, pp. 6-7]. Under the PSP, if a vendor is accepted by a policyholder to perform specified work, the policyholder will sign off on a work authorization [Doc. 38, pp. 11-12, 173-74]. From then on, the vendor works only for the policyholder on that project [*Id.*].

19.     Joseph Construction uses the Xactimate computer program to prepare estimates on all its restoration jobs, including the estimate Nickels' prepared for plaintiffs' home [Doc. 39, pp. 28-29].

20.     On June 9, 2008, Joseph Construction submitted an estimate for $140,311.56 for the repair of plaintiffs' home [Doc. 39, p. 9; Pl.'s Ex. 6]. This estimate determined that plaintiffs' home had no foundation damage and that the majority of the floor and wall framing could be retained during a repair [Doc. 39, p. 9; Pl.'s Ex. 6]. Joseph Construction's estimate consists of more than thirty (30) pages [Pl.'s Ex. 6].

21.     Plaintiffs rejected Joseph Construction's estimate [Doc. 42, pp. 35-42].

22.     On June 20, 2008, in proposed settlement of plaintiffs' claim, State Farm, through

        Harris, formally extended a settlement offer of $165,563.00 for repair of their home

        under Coverage A (Dwelling) [Doc. 25, p. 7; Doc. 38, pp. 47-48, 138].

23.     State Farm issued plaintiffs a $165,563.00 check which plaintiffs never deposited

        [Doc. 38, p. 48].

24.     State Farm offered plaintiffs $152,640.00 under Coverage B (Personal Property) and

        $40,400 under Coverage C (Loss of Use/Additional Living Expense) [Doc. 25, p. 7].

25.     State Farm did not ask plaintiffs for a release in conjunction with the settlement offer

        [Doc. 38, p. 181].

26.     Under the terms of plaintiffs' policy, plaintiffs would have been allowed to present

        supplemental damages in the event the cost of repairing plaintiffs' home exceeded the

        amount of the settlement offer [Doc. 38, p. 181].

27.     On July 21, 2008, plaintiffs' attorney notified State Farm that its bid to repair the

        portions of plaintiffs' home that State Farm determined were actually damaged

        amounted to bad faith [Doc. 30, ¶ 11].

28.     On July 29, 2008, Harris requested and received plaintiffs' permission to retain a

        structural engineer to evaluate the structure of plaintiffs' home, including the

        condition of the foundation, wood, and floor frames [Doc. 39, pp. 60-67].

29.     Todd Duncan ("Duncan") is a structural engineer employed by Structural Engineering

        Assessments, P.C. [Doc. 39, pp. 40-41]. At Harris's request and with plaintiffs'

        approval, Duncan inspected plaintiffs' home and concluded that the home did not

need to be demolished, that the foundation of the home was undamaged, and that the majority of the wood and floor framing could be retained and did not need to be replaced [*Id.*, 46-50; Def.'s Exs. 2, 3]. Duncan testified at trial as a witness for State Farm.

30.     Nickels reviewed Duncan's report and concluded that the report was generally in line with Joseph Construction's estimate except for some parts related to water damage, and that Joseph Construction's dollar estimate did not change based on what was contained in Duncan's report [Doc. 38, p. 145-46].

31.     Copeland's first estimate, dated May 16, 2008, was for $251,894.25 and called for the complete demolishment of plaintiffs' home [*supra* ¶ 11; Pl.'s Ex. 7; Doc. 38, p. 91]. Copeland prepared two additional estimates, dated May 7, 2010, one for $258,172 for the complete demolishment and rebuilding of plaintiffs' home, the other for $203,005.39 to repair and replace the damaged portions of plaintiffs' home as long as there was no foundation damage [Doc. 38, pp. 90-91; Pl.'s Ex. 4]. In total, these two estimates consist of almost ten (10) pages [Pl.'s Ex. 4].

32.     Copeland testified at trial that there was not, at present, any damage to the foundation of the home [Doc. 38, pp. 87-90].

33.     On April 14, 2008, the day of the fire, State Farm paid plaintiffs $2,000.00 for immediate living expenses [Doc. 30, ¶ 21].

34.     On May 29, 2008, pursuant to Coverage C, State Farm approved plaintiffs for a six-month term for a fully furnished rental home at the cost of $3,000.00 per month [Doc. 30, ¶ 22].

35.     On December 1, 2008, pursuant to Coverage C, State Farm approved plaintiffs for another six-month term for a fully furnished home at $3,000.00 per month.  This approval extended until June 2009 [Doc. 30, ¶ 23].

36.     On December 23, 2008, plaintiffs made a formal written demand on State Farm for payment of their policy limit on their dwelling [Doc. 25, p. 7].

37.      State Farm failed to pay the amount of the loss set forth in plaintiffs' demand within sixty (60) days from the date of the demand [Doc. 25, p. 7].

38.     In June 2009, State Farm did not extend plaintiffs' Coverage C approval [Doc. 30, ¶ 25].  To date, State Farm has paid plaintiffs $40,400.00 under Coverage C [*Id.*, ¶ 26].

39.     State Farm is not alleging plaintiffs made any misrepresentations (written or oral) in connection with their policy or any claim made thereunder [Doc. 25, p. 7].

40.     With respect to plaintiffs' claim under Coverage A (Dwelling), the parties agree that damage to plaintiffs' dwelling (including all fixtures) is total (so as to require replacement with new materials or items of like kind and quality), except with respect to the various structural elements and members of the dwelling (*e.g.*, roof trusses, studs, joists), the extent of damage to which is disputed [Doc. 25, p. 7].

8

II.    **Conclusions of Law**

A.    **Breach of Contract**

1.    Under Tennessee law, the interpretation of an insurance contract is a matter of law for determination by the court and courts are instructed to construe insurance policies in the same manner as any other contract. *Corrington v. Equitable Life Assur. Soc. of U.S.*, 265 F. Supp. 2d 905, 909 (W.D. Tenn. 2003); *see also Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 305-06 (Tenn. 2007) (citation omitted). Courts should give effect to the parties' intentions as reflected in the written contract of insurance. *Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996). As with all contracts, a court should construe insurance policies in a fair, reasonable, and logical manner, giving the policy language its usual and ordinary meaning. *Travelers Indem. Co. of Am.*, 216 S.W.3d at 306 (citations omitted). In the absence of fraud or mistake, courts should give effect to a contract as written. *Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998) (citing *Allstate Ins. Co. v. Wilson,* 856 S.W.2d 706, 708 (Tenn. Ct. App. 1992)).

2.    When the provisions of an insurance policy are clear and unambiguous, a court's construction of the policy should favor neither party. *Brown v. Tennessee Auto. Ins. Co.*, 237 S.W.2d 553, 554 (Tenn. 1951); *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 20 (Tenn. Ct. App. 2002). Courts are also advised to avoid artificially narrowing the policy's coverage or extending coverage beyond the policy's

9

intended scope. *Massachusetts Mut. Life Ins. Co.*, 104 S.W.3d at 20. However, when a policy provision is susceptible to more than one construction, an ambiguity exists and the provision must be construed against the carrier and in favor of the insured and coverage. *Memphis Furniture Mfg. Co. v. American Cas. Co.*, 480 S.W.2d 531, 532-33 (Tenn. 1972). Under Tennessee law, an insured is conclusively presumed to have knowledge of the terms of his or her insurance contract, and the insured is bound by the terms of that policy. *De Ford v. Nat. Life & Acc. Ins. Co.*, 185 S.W.2d 617, 621 (Tenn. 1945). *See, e.g., PacTech, Inc. v. Auto-Owners Ins. Co.*, 292 S.W.3d 1, 11 (Tenn. Ct. App. 2008).

### 1. Coverage A

3.    Plaintiffs claim that State Farm was in breach of Coverage A. Plaintiffs also contend that under the terms of Coverage A, State Farm was required to restore plaintiffs to the position they were in immediately prior to the fire and that State Farm's settlement offer of $165,563.00 was patently inadequate because it did not place them in this position. Plaintiffs also contend that bad faith conduct of State Farm and its agents made it impossible for them to replace their home before claiming under their policy's replacement coverage. Alternatively, plaintiffs contend that the terms of Coverage A are ambiguous.

4.    Coverage A (Dwelling) provides, in pertinent part:

    1.A1 – Replacement Cost Loss Settlement – Similar Construction.

a. We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I –COVERAGE A–DWELLING . . .

. . . .

(2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property or an amount up to the applicable limit of liability shown in the Declarations, whichever is less[.]

[Pl.'s Ex. 1].  The Court will first address plaintiffs' argument that the above terms are ambiguous.  The Court will then address plaintiffs' arguments that State Farm was in breach of Coverage A and acted in bad faith.

5.  The terms of Coverage A relating to State Farm's obligation to "repair or replace with similar construction" the "damaged part of the property" are not ambiguous.  Plaintiffs have referenced *Stoops v. First Am. Fire Ins. Co.*, 22 S.W.2d 1038 (Tenn. 1930), a case construing the liability of an auto insurance carrier for collision damage to the insured's vehicle.  *Id.*  In *Stoops*, the Tennessee Supreme Court found that an ambiguity arose from the policy's use of the term "or" twice in the same sentence within a clause.  *Id.* at 1039.[2]  The *Stoops* court found that the double use of "or" created an ambiguous "double alternative" because neither the sentence nor the clause

_____

[2]The clause found by the *Stoops* court to be ambiguous was in the "general conditions" part of the insurance contract and provided that the insurer's liability for loss or damage to the insured "shall in no event exceed the limit of liability, if any, stated in Paragraph C (actual cash value, less $50.00), *nor what it would then cost to repair or replace the automobile or parts thereof with other of like kind and quality*."  *Id.*, 22 S.W.2d at 1038 (emphasis in original).

11

provided the circumstances under which the costs to repair or replace the automobile was the measure or limit of the insurance, and the circumstances under which the measure or limit of the insurance was the cost to repair or replace only the parts of the automobile. *Id.*

6.   Coverage A does not contain an ambiguous double alternative similar to the one in *Stoops*. Rather, the terms of Coverage A clearly and unambiguously state that State Farm "will pay the cost to **repair or replace** with similar construction and for the same use on the premises shown in the Declarations, the **damaged part of the property**[.]" [Pl.'s Ex. 1 (emphasis added)]. The Court concludes that this language is not susceptible to any meaning other than requiring State Farm to "repair or replace" the damaged parts of plaintiffs' property. Contrary to plaintiffs' contentions, there is nothing in the policy that requires State Farm to pay plaintiffs the full policy limits as a result of their loss[3] and nothing that requires State Farm to replace parts of the home that were undamaged by the fire [*see* Doc. 38, pp. 168-70].

---

[3]At trial, plaintiff Tracy Wilson's testimony indicated he did not completely understand the policy:

| Defense Counsel: | You understand that, just because there are limits on your policy, that doesn't mean that you're automatically entitled to the limits [under the policy] just because you have a loss? |
| Plaintiff: | To be honest, I don't know exactly. I've never had this to happen. I don't know how it works. You know, I just pay the premiums and go back to work and pay them again. |

[Doc. 38, pp. 66-67].

7.    State Farm's settlement offer of $165,563.00 is not patently inadequate and State Farm, by and through its agents, did not engage in bad faith conduct amounting to a breach of State Farm's obligations under Coverage A.  Immediately following the fire, Harris met with plaintiffs regarding their coverage and the claims proceeding.  Shortly after the fire, Harris offered to help plaintiffs secure alternative housing.  To this end, Harris testified that he gave plaintiffs a $4,400 check for living expenses and rent.  Log entries from the Claims Log, a daily record created and kept by Harris detailing the claims proceeding, show that in the weeks following the fire, Harris was involved in a number of telephone calls concerning the claims proceeding and made several visits to plaintiffs' damaged home.  At trial, Harris explained the steps he took to investigate the damage to plaintiffs' home, including: taking photographs and notes; making measurements of the damage; drawing diagrams of the home and damaged components; discussing the damage with plaintiffs; and using a computer program to prepare an estimate for repair and replacement [Doc. 38, pp. 120-29].  Harris also gave a detailed explanation of his estimate.  Harris testified that he attempted to contact two of the three contractors from whom plaintiffs obtained estimates.  When plaintiffs refused Harris's estimate, Harris contacted Joseph Construction to do a second estimate and Nickels, on behalf of Joseph Construction, came to plaintiffs' home to investigate the damage.  Nickels also prepared an estimate of the damage to plaintiffs' home.  After plaintiffs rejected Joseph Construction's estimate, Harris offered and arranged for Duncan, a structural engineer, to evaluate

13

the damage sustained by plaintiffs' home and write up a report on his findings. Finally, the Claims Log indicates that Harris was involved in the claims proceeding until plaintiffs obtained an attorney in late July 2008. Upon review, the Court finds no indication of bad faith conduct on the part of Harris in regard to the interaction and communication described above.

8.    There is no evidence that Carey acted in bad faith during State Farm's investigation of plaintiffs' loss and the claims proceeding. Plaintiffs assert that Carey determined, early in the claims proceeding and without investigation, that plaintiffs' home would only be repaired. At trial, Carey testified that "[a]s soon as [Harris] completed his estimate," he "felt pretty confident that [State Farm] could restore [plaintiffs' home] within the policy limits." [Doc. 39, p. 74]. Carey testified that his opinion was based on years of experience working with fire damaged homes [*Id.*, p. 65]. The Court does not find this opinion to be one formed in bad faith or without investigation. As indicated by Carey's testimony, Carey arrived at his opinion *after* Harris had done an investigation and determined that plaintiffs' home could be repaired. Moreover, Harris's determination regarding plaintiffs' home was based on Harris's years of experience investigating fire damage and loss claims. The Court also notes that Carey's opinion that the home could be repaired was consistent with Joseph Construction's estimate and Duncan's findings after their respective investigations.

9.    The Court concludes that State Farm acted reasonably in regard to plaintiffs' claim and extending the settlement offer. Harris, who has extensive experience

investigating fire damage and loss claims, completed a very detailed, thirty-one (31) page estimate of the damage to plaintiffs' home and determined that the home could be repaired. At trial, Harris testified in detail about his conduct during his investigation of plaintiffs' claim and the basis for his estimate and determination that plaintiffs' home could be repaired [Doc. 38, pp. 120-26]. Plaintiffs rejected Harris's estimate and Harris contacted Joseph Construction to prepare a second estimate. Nickels, who has extensive experience in fire damage and restoration projects, completed a detailed, thirty (30) page estimate and determined that plaintiffs' home could be repaired and that the home's foundation and the majority of the the framing was intact and structurally sound. Nickels testified that there was nothing unusual about the damage to the home and nothing that made him think it was not restorable [Doc. 39, pp. 7-9]. At trial, Nickels gave a detailed, line-by-line explanation of his estimate and testified that the home could be repaired without damaging the foundation, driveway, or sidewalks [*Id.*, pp. 7-19]. Joseph Construction's estimate was also rejected by plaintiffs. Duncan, a structural engineer, evaluated the structure of plaintiffs' home and determined that the home could be repaired. Duncan found that the foundation was not damaged and that the majority of the home's framing did not need to be replaced. At trial, Duncan testified that the home had "pretty minor" fire damage [*Id.*, p. 57] and he provided a detailed explanation of his observations and his resulting report [*Id.*, pp. 43-57]. Duncan testified that charred items and wood in the home could be removed and replaced and that certain damaged framing, wood

15

trusses, and floor joists could also be replaced [*Id.*, pp. 46-49]. Duncan compared his report to Copeland's estimate, noting that while Copeland had recommended that the entire structure of the home needed to be rebuilt, "you don't have to completely rebuild every time a structure is damaged, but you are allowed to replace only damaged items and put them back. This typically involves the judgment of an engineer." [*Id.*, p. 47]. Given the foregoing, the Court concludes that State Farm's determination that plaintiffs' home could be repaired for an amount below the policy limits was derived from three credible sources, two with a great deal of fire repair and restoration experience, and one with experience in structural engineering. Upon the Court's review and consideration of those estimates, the Court does not find State Farm's settlement offer of $165,563.00 to repair the damaged parts of plaintiffs' home to be patently unreasonable.

10. While plaintiffs argue that neither State Farm nor Joseph Construction performed destructive testing, took samples of materials from the home for testing, or measured the oxidation of materials in the home to gauge the impact of gas or smoke, it does not appear that such testing was done by Copeland or any of the other general contractors, and plaintiffs have put forth no evidence that such measures are required for making a reasonable estimate of the damage to the home. Moreover, there is no evidence as to what the results of such tests would be if they had been performed or if the results would led to a conclusion that the home should be demolished and rebuilt or a conclusion that the home could be repaired. Finally, while plaintiff Tracy Wilson and

16

Copeland testified that the home would not be the same after a repair, unlike Harris, Carey, and Nickels, neither has experience doing fire damage restoration work. Accordingly, the Court finds that the opinions of plaintiff Tracy Wilson and Copeland are not as probative as the opinions and estimates of Harris and Nickels and Duncan's report. Plaintiffs have not proven that State Farm was in breach of Coverage A by relying on the detailed estimates prepared by Harris and Joseph Construction, estimates which were augmented and confirmed by Duncan's findings.

11. The Court concludes that State Farm was not in breach of Coverage A by declining to follow or rely upon the three estimates by the general contractors. These estimates, each a single page in length and lacking the detail and depth of the estimates provided by Harris and Joseph Construction, were obtained by plaintiffs after Harris suggested they find a contractor to give a written bid to build new or rebuild the home so the bids could be compared to Harris's estimate.[4] Harris testified that it was his practice to review bids and estimates submitted by general contractors, speak with the contractors, and compare their bids to his own estimate to determine if any changes needed to be made [Doc. 38, pp. 129-30]. Harris pointed out, however, that the bids and estimates of plaintiffs' general contractors are not detailed and call only for the demolition and rebuilding of plaintiffs' home without any explanation for why it

---

[4]Copeland testified that he prepared his first estimate after being asked by plaintiff Tracy Wilson to "giv[e] him a bid on a house." [Doc. 38, p. 77].

could not be repaired [*Id.*].[5] Copeland, upon whose estimate and testimony plaintiffs'
relied upon at trial, was the only one of these general contractors to testify.

12. Upon review, Copeland's testimony and the estimates he submitted, along with the
other estimates submitted by plaintiffs, do not demonstrate to the Court that State
Farm's determination that plaintiffs' home could be repaired was unreasonable or
constituted a breach of Coverage A. For instance, Copeland testified that the
foundation of the home was currently *not damaged*, but in his view as a general
contractor, there was a 51% chance that the foundation *would be damaged* in a
selective demolition or taking apart of plaintiffs' home [*Id.*]. Plaintiff Tracy Wilson
and Copeland, neither with fire repair or restoration experience, also testified that the
driveway, footers, and sidewalk around plaintiffs' home were *not damaged*, despite
amounts required for the replacement of these items being included in Copeland's
initial estimate [*Id.*, p. 59]. On the other hand, Nickels, who has extensive experience
in fire repair and restoration, testified that repair of plaintiffs' home could be
accomplished *without damaging* the foundation, the driveway, or the sidewalk [Doc.
39, pp. 7-19]. Upon the Court's review and consideration of this testimony and
plaintiffs' estimates, and the testimony and estimates of Harris, Nickels, and Duncan,
the Court does not find plaintiffs' estimates to be more supported by the evidence or

---

[5]A second and third estimate prepared by Copeland closer to trial provides another estimate
for a demolition and rebuilding of plaintiffs' home, along with an estimate for a repair of plaintiffs'
home [Pl.'s Ex. 4].

reflective of the damage to plaintiffs' home than the estimates of Harris and Joseph Construction, augmented by Duncan's findings.

13. In sum, the Court concludes that State Farm was not in breach of its contractual obligations under Coverage A. There is nothing in the unambiguous terms of Coverage A that require State Farm to completely rebuild plaintiffs' home or replace the undamaged parts. Rather, Coverage A requires State Farm to repair or replace "the damaged part of the property." The Court has also considered all of the estimates presented, the testimony supporting those estimates, and Duncan's findings and plaintiffs' testimony and evidence regarding the damage to their home. Based on this evidence, the Court does not find the detailed estimates submitted by Harris and Joseph Construction to be unreasonable, prepared or offered in bad faith, or in breach of Coverage A. While plaintiff Tracy Wilson and Copeland, neither with fire damage or restoration experience, testified that it was their opinion that plaintiffs' home could not be repaired, the estimates submitted by Harris and Joseph Construction, both with extensive fire restoration and repair experience, and the findings of Duncan, a structural engineer, preponderates towards State Farm's determination that plaintiffs' home could be repaired and that State Farm's settlement offer of $165,563.00 would repair the portions of their home that were actually damaged. Further, State Farm did not demand a release with the settlement offer and plaintiffs could have petitioned for additional amounts necessary to repair the damaged portions of their home. Plaintiffs' rejection of State Farm's settlement offer because they disagreed with State Farm

about whether their home could be repaired does not support the conclusion that State Farm was in breach of Coverage A.

### 2. Coverage C

14. Plaintiffs also claim that State Farm was in breach of its contractual obligations under Coverage C. Coverage C requires State Farm to "cover the necessary increase in cost [plaintiffs] incur to maintain [their] standard of living for up to 24 months. [State Farm's] payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for [plaintiffs'] household to settle elsewhere; or (c) 24 months." [Pl.'s Ex. 1]. State Farm paid plaintiffs' living expenses for 13 months following the fire but refused to extend Coverage C approval past that time. Plaintiffs argue that State Farm is in breach of Coverage C and that they are entitled to receive their living expenses for the full 24 months allowable under the policy. Alternatively, plaintiffs assert that the terms of Coverage C are ambiguous and do not specify any criteria for determining the time reasonably required to repair or replace their home under the circumstances. State Farm contends that it should not be found in breach of Coverage C because *had* plaintiffs acted in good faith and attempted to mitigate their damages, their home *could* have been repaired during the six-month period after State Farm extended the settlement offer.

15. After giving due consideration to Copeland's testimony, the testimony of Harris, Nickels, and Carey, the testimony of plaintiffs, and the estimates regarding the damage to plaintiffs' home, the Court does not find Copeland's estimates to be

patently unreasonable or an indication that plaintiffs did not negotiate in good faith by taking the position that Copeland's estimates were correct. Rather, this case involves a legitimate dispute as to the nature and extent of the damage to plaintiffs' home—whether it was repairable or whether it must be completely demolished, and whether State Farm's settlement offer conformed to the terms of the policy. Neither the terms of the policy nor the testimony or evidence at trial indicate the amount of time necessary to make the estimated repairs to plaintiffs' home. Further, the only evidence the Court has that plaintiffs failed or refused to mitigate their damages is that several months after the fire, Harris drove by plaintiffs' home and noticed that holes caused by the fire were no longer covered with a tarp, thereby permitting water to get into the home [Doc. 38, pp. 140-41; Def.'s Ex. 32]. There is no evidence as to whether these holes remained uncovered, for how long, or whether plaintiffs or someone else removed the covering.

16.    As noted *supra*, when a policy provision is susceptible to more than one interpretation, an ambiguity exists and the provision must be construed against the insurer and in favor of the insured and coverage. *Memphis Furniture Mfg. Co.*, 480 S.W.2d at 532-33. *See, e.g., Marlin Fin. & Leasing Corp. v. Nationwide Mut. Ins. Co.*, 157 S.W.3d 796, 809 (Tenn. Ct. App. 2004) ("The law is well-settled . . . that any uncertainties or ambiguities in an insurance policy must be construed strongly against the insurer and in favor of the insured.'") (citation omitted). Given the lack of evidence as to the length of time necessary to make the repairs to plaintiffs' home, the

lack of evidence showing failure to mitigate, and the parties' legitimate dispute regarding the amount of damage to the home, the Court will construe this provision against State Farm and in favor of plaintiffs. *See Memphis Furniture Mfg. Co.*, 480 S.W.2d at 532-33. The Court, therefore, concludes that State Farm has not satisfied its obligations under Coverage C and State Farm shall pay to plaintiffs the full 24 months allowable under the policy. As State Farm has paid 13 months of payments pursuant to Coverage C, State Farm will be ordered to pay the remaining 11 months at a cost of $3,000 per month for a fully furnished home, for a total amount of $33,000.00.

**B.     TCPA Claims**

17.     Plaintiffs claim that State Farm violated the TCPA's general prohibition that "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices[,]" Tenn. Code Ann. § 47-18-104(a), along with four other specific provisions. *Id.* § 47-18-104(b)(3) (causing the likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by another); *id.* § 47-18-104(b)(5) (representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have); *id.* § 47-18-104(b)(7) (representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another); *id.* § 47-18-104(b)(27) (engaging in any other act or practice which is deceptive to the consumer or to any other person). Plaintiffs also

seek treble damages for a "willful or knowing violation" of the TCPA. *Id.* § 47-18-109(a)(3). As support for these violations, plaintiffs assert that State Farm, through its agents, determined, without investigation, that their home would only be repaired; that State Farm characterized Joseph Construction as an independent third party with no connection to State Farm and led plaintiffs to believe that Joseph Construction's estimate was independent and unbiased, knowing that it would be similar to its own; and that State Farm acted in bad faith by relying on an estimate prepared by Nickels, who was not a licensed general contractor. State Farm denies that it violated the TCPA and contends that it reasonably investigated and determined the amount of the settlement offer. State Farm also asserts that it was justified in rejecting plaintiffs' estimates and that it did not misrepresent its relationship to Joseph Construction.

18.    In *Office Furniture & Related Servs. Inc. v. United Const. Corp.*, No. M2003-02126-COA-R3-CV, 2005 WL 378707 (Tenn. Ct. App. Feb. 16, 2005), the defendant, a roofing contractor, appealed the trial court's finding that it beached express and implied warranties and violated subsections (5) and (7) of the TCPA. *Id.* at *2-*5. The Tennessee court of appeals affirmed the trial court's conclusion that there had been a breach of warranty, but reversed the trial court as to any finding that the defendant had violated the TCPA. At the outset, the *Office Furniture* court noted that TCPA claims "must be stated with the particularity of common-law fraud claims under Tenn. R. Civ. P. 9.02." *Id.* at *5 (citing *Harvey v. Ford Motor Credit Co.*, 8

S.W.3d 273, 275-76 (Tenn. Ct. App. 1999); *Humphrey v. West End Terrace, Inc.*, 795

S.W.2d 128, 132 (Tenn. Ct. App. 1990)).  The *Office Furniture* court noted that:

> [A]lthough a breach of contract claim and a [TCPA] claim may arise
> from the same course of conduct, they are separate and distinct causes
> of action, each with its own separate elements and defenses [citations
> omitted].  As we held in *Hall v. Hamblen*, No. 2004 WL 1838180
> (Tenn. Ct. App. Aug. 16, 2004) . . . breach of contract and violation of
> the [TCPA] are two different causes of action, and existence of one
> does not necessarily establish the existence of the other. *Id.* at *4.  In
> order to be successful under the [TCPA] it must be proven that "there
> was some deception, misrepresentation or unfairness, regardless of any
> breach of contract." *Id.* [citation omitted].  A breach of contract or
> warranty is not and of itself a deception, misrepresentation or
> unfairness under the [TCPA].

*Id.* at *5.

19.     Plaintiffs' arguments supporting their claim that State Farm violated the TCPA largely

mirror the arguments plaintiffs made in support of their breach of contract

claims—that State Farm did not perform a reasonable investigation, unjustifiably

disregarded the estimates submitted by plaintiffs, and that the settlement offer was

patently inadequate.  The Court has previously concluded that State Farm was not in

breach of Coverage A in its investigation of plaintiffs' claim and by declining to

follow the estimates submitted by plaintiffs.  These conclusions apply equally to

plaintiffs' arguments that State Farm engaged in conduct in violation of the TCPA

when it investigated plaintiffs' claim and made the settlement offer.  Similar to the

situation presented in *Office Furniture*, plaintiffs cannot, without more, convert their

breach of contract claims and their disagreement with State Farm as to the nature and

24

scope of damage their home sustained and the amount of repair needed into violations of the TCPA.

20.     As to plaintiffs' argument that State Farm engaged in deceptive practices by characterizing Joseph Construction as an independent third party with no connection to State Farm, the Court concludes that the evidence does not preponderate towards a finding that State Farm or its agents misrepresented the relationship between State Farm and Joseph Construction. Joseph Construction was a participant in State Farm's PSP, a relationship that benefitted Joseph Construction and could result in business referrals and potential clients for the company [Doc. 39, pp. 28-29]. However, this alone does not support a finding of deceptive conduct. Plaintiffs' evidence that State Farm misrepresented the relationship between the companies is based on plaintiff Tracy Wilson's testimony that Harris told him the companies had no relationship and plaintiffs' argument that the estimates of the two companies were similar and created by the same computer program.[6] After reviewing this evidence, the Court finds it does not support a finding of deceptive practices.

21.     Plaintiff Tracy Wilson testified that Harris told him that Joseph Construction was a "neutral party" and that State Farm had no relationship to Joseph Construction [Doc. 38, p. 35]. Harris, on the other hand, testified that when he went to plaintiffs' home with Nickels, he told plaintiff Tracy Wilson about the companies' relationship and the

_____

[6]Harris and Joseph Construction used Xactimate to prepare their estimates. Copeland testified that he used 2010 Craftsman, another computer program, to prepare his estimate.

PSP [*Id.*, p. 126]. Harris also testified that he was not aware there was an issue regarding the PSP until the beginning of litigation [*Id.*, p. 182].

22. Plaintiff Tracy Wilson's testimony at trial was inconsistent and conflicted with other evidence in several relevant areas. As State Farm points out, plaintiff Tracy Wilson's testimony about the purchase price of the property on which his home was located was inconsistent with the warranty deed he signed at the time he purchased the property [Doc. 38, p. 60; Def.'s Ex. 33]. He also testified that after the fire, Carey called him and asked if he would take a settlement offer of $180,000 without the names of Chase and AmTrust, the two mortgage companies listed as lienholders on plaintiffs' home [Doc. 38, p. 46]. Carey denied making this offer and gave a credible explanation for why, as someone experienced in handling insurance claims, he would not have extended such an offer because it could result in State Farm paying twice for the loss [Doc. 39, p. 63]. In addition, while plaintiff Tracy Wilson testified that Harris was difficult to contact during the claims proceeding, this testimony is belied by Harris's testimony, the entries in the Claims Log regarding the interactions and communications between plaintiffs and Harris, and plaintiff Tracy Wilson's own testimony regarding his interactions and communications with Harris. Plaintiff Tracy Wilson also testified that he felt State Farm was forcing him to accept the settlement offer by its reliance on Joseph Construction's lower estimate. He acknowledged, however, that he knew he did not have to accept Joseph Construction as a contractor because he knew that he could chose his own contractor under the policy [Doc. 38,

pp. 45-46]. Furthermore, Harris testified that plaintiff Tracy Wilson told him he did not plan to hire Joseph Construction but intended to act as his own general contractor to rebuild his home [*Id.*, p. 131]. The Court also notes that the estimate by Joseph Construction states that it is an "estimate only" and includes a "Structural Damage Claim Policy" sheet which contains language indicating the nature of the relationship between Joseph Construction and State Farm:

> State Farm cannot authorize any contractor to proceed with work on your property. Repairs should proceed only with your authorization.
>
> . . . .
>
> It is understood that the contractor is hired by you, our insured, and that they work for you, not State Farm.

[Pl.'s Ex. 6]. This language is consistent with the relationship between the companies as described by Harris, Carey, and Nickels. Finally, the Court notes that, under these circumstances, if a beneficial relationship alone was enough to indicate deception and bad faith, plaintiffs' relationship with Copeland could also be suspect, as Copeland testified at trial that he knew plaintiffs because their company did and continues to do mechanical work on the vehicles for Copeland's company [Doc. 38, p. 77]. Given the foregoing, the Court finds Harris and Carey's testimony regarding their statements about the relationship between Joseph Construction and State Farm to be more credible than plaintiff Tracy Wilson's assertions that Harris or Carey misrepresented the relationship between the companies.

23. The Court concludes that State Farm's reliance on the estimate prepared by Nickels does not show a violation of the TCPA. While Nickels was not a general contractor, he worked for Joseph Construction, who *is* a licensed general contracting company and there is no evidence that Nickels was not authorized to act on behalf of Joseph Construction and under its license. Further, Nickels testified that he has extensive experience in fire damage and restoration and his detailed explanations of his estimate support this assertion.

24. In sum, while plaintiffs have argued that State Farm intentionally or negligently deceived plaintiffs by tending to induce them to settle for a lower amount to repair their home, after a thorough review of the evidence and of the parties' arguments in the post-trial briefs, the Court has not found evidence of any such deception, let alone a "willful or knowing violation" of any provision of the TCPA, a condition precedent to a treble damage award under the Act.

### C. Bad Faith Refusal to Pay Claim

25. Plaintiffs claim that State Farm violated the Tennessee bad faith refusal to pay statute, Tenn. Code Ann. § 56-7-105, in which a plaintiff must prove the following: that "(1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith." *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct.

28

App. 1986); *Ginn v. Am. Heritage Life Ins. Co.*, 173 S.W.3d 433, 443 (Tenn. Ct. App. 2004). This statute is penal in nature and must be strictly construed. *See Minton v. Tennessee Farmers Mut. Ins. Co.*, 832 S.W.2d 35, 38 (Tenn. Ct. App. 1992). The plaintiff has the burden of proving bad faith on the part of the insurer. *Palmer*, 723 S.W.2d at 126. The Tennessee court of appeals has explained that:

> The bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss. *An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does not afford coverage for the alleged loss.*

*Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 852 (Tenn. Ct. App. 1982) (emphasis in original) (quoting *Nelms v. Tennessee Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. Ct. App. 1978)). The parties have stipulated to the first three elements and the only element in dispute is (4), whether the refusal to pay was in bad faith.

26. Plaintiffs assert that the same arguments and facts support this claim as support their claims for violations of the TCPA. Thus, having found no evidence of deceptive conduct to support a violation of the TCPA, the Court has also considered whether plaintiffs' arguments support a violation of the Tennessee bad faith refusal to pay statute.

27. Upon review of the evidence, and in light of the Court's determination that State Farm was not in breach of Coverage A, that State Farm did not misrepresent its relationship to Joseph Construction or engage in deceptive conduct, the Court concludes that State Farm had substantial legal grounds upon which to refuse to pay the amount sought by

plaintiffs. Plaintiffs have provided no evidence that this case involves bad faith and is anything more than a legitimate dispute regarding the nature and amount of damage to their home. Accordingly, given the evidence and the terms of plaintiffs' policy, there is simply no evidence that State Farm's refusal to pay the amount plaintiffs requested was in bad faith.

### D.    Prejudgment Interest

28.    Plaintiffs have requested an award of prejudgment interest. State Farm contends that an award of prejudgment interest is not appropriate. This is a diversity case so Tennessee law regarding prejudgment interest applies. *FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000). Under Tennessee law, prejudgment interest may be awarded, up to a maximum annual rate of 10%. Tenn. Code Ann. § 47-14-123. Prejudgment interest is not awarded as a matter of right. Rather, its allowance under Tennessee law is discretionary with the trial court. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). The Tennessee Supreme Court has noted that the purpose of awarding prejudgment interest "is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Myint v. Allstate Ins. Co*., 970 S.W.2d 920, 927 (Tenn. 1998).

29.    Tennessee courts have set forth various guidelines to bound the zone of choice when an award of prejudgment interest is under consideration. An award of prejudgment interest is generally allowable when the amount in dispute is certain and when liability

was not in dispute.  *See Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994).  The uncertainty of either the existence or amount of an obligation does not mandate a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable. *Hunter v. Ura,* 163 S.W.3d 686, 706 (Tenn. 2005).  In addition, if there has been a delay in securing a judgment, courts will also examine whether the defendant is responsible for the delay.  For instance, a defendant that made repeated requests for continuances and caused the case to languish for almost two and a half years was required to pay prejudgment interest in *Mold-Tech USA, LLC v. Holley Performance Products, Inc.*, No. E2004-01938-COA-R3-CV, 2005 WL 2051289 (Tenn. Ct. App. Aug. 26, 2005). However, in *Mold-Tech*, the Tennessee court of appeals noted that the "purpose of prejudgment interest is to compensate the plaintiff for the lost time value of the money" and affirmed an award of interest based on the rate of 4% interest, not the 10% maximum allowed by statute.  *Id.* at *8.

30.     Upon a review of the facts of this case, the Court concludes that an award of prejudgment interest is not appropriate.  State Farm had a reasonable basis to dispute liability and there is no evidence that State Farm was responsible for any delay in litigation and the resolution of this case.  Further, given the Court's conclusion that State Farm was not in breach of Coverage A, did not violate the TCPA, and did not violate the bad faith refusal to pay statute, the Court does not find the principles of

31

equity to support a determination that prejudgment interest is required to fully compensate plaintiffs.

## III.  Conclusion

In sum, and based upon the foregoing findings of fact and conclusions of law, the Court finds that plaintiffs Tracy and Kim Wilson have proved, by a preponderance of the evidence, that defendant State Farm Fire and Casualty Company did not fulfill its obligations under Coverage C.  Accordingly, the Court will enter judgment in favor of plaintiffs in the amount of $33,000.00.  The Court also finds that plaintiffs failed to establish, by a preponderance of the evidence, the following: that State Farm was in breach of Coverage A, that State Farm violated the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq*., and that State Farm violated the Tennessee bad faith refusal to pay statute, Tenn. Code Ann. § 56-7-105.  An appropriate order will be entered.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE